# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

                    Plaintiff,

      vs.

ANTONIO HOSEA WALLACE,

                    Defendant.

3:21-CR-00059-TMB-MMS

**FINAL REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS [DKT. 51]**

## I.    MOTION PRESENTED

The indictment, filed in May 2021, charges Antonio Hosea Wallace with one count of possessing controlled substances with intent to distribute[1] and one count of possessing a firearm in furtherance of drug trafficking.[2][3] Dkt. 2. Wallace has moved to suppress all the evidence obtained from three search warrants, and following his arrest, on several bases: (1) the information offered in the affidavits for SW 172 and SW 173 was stale; (2) the affidavits for SW 172 and SW 173 failed to establish probable cause; (3) Trooper Michael Henry intentionally or recklessly omitted several material pieces of information and that, had that information been included or further corroborated, the affidavits would not have supported probable cause; (4) the good-faith exception should not save SW 172

---

[1] 21 U.S.C. § 841(a)(1), (b)(1)(C)
[2] 18 U.S.C. § 924(c)(1)(A)(i)
[3] The government notified this Court and Wallace that it erred in citing § 841(b)(1)(C); the correct statute being § 841(b)(1)(A). Dkt. 18.

and SW 173 because Trooper Henry knowingly or recklessly mislead the Magistrate Judges, and because the affidavits were bare bones affidavits; (5) Wallace's detention and interrogation were both coerced and tainted by the invalidity of SW 172; and (6) the information in the affidavit for SW 3952 was tainted by the invalidity of SW 172 and the coerced interrogation. *See generally* Dkt. 51.

The government responds that (1) the firearm seized pursuant to SW 173 should be suppressed because its seizure was outside the scope of SW 172; (2) probable cause existed for SW 172 and SW 173; (4) Trooper Henry was at worst negligent in writing the affidavits because he likely relied on his incident report and relied on the most up-to-date information available at the time, and the alleged omissions were not material; (4) the good faith exception applies to SW 172 and SW 173 because the record does not indicate that Trooper Henry knowingly or recklessly omitted information, and that there was ample facts in the affidavits; and (5) law enforcement did not expressly or inherently coerce Wallace during the custodial interrogation. *See generally* Dkt. 61.

This Court, in June 2022, held two *Franks* evidentiary hearings and the parties timely filed post-hearing briefs that same month. Dkt. 65; Dkt. 72; Dkt. 73; Dkt. 85; Dkt. 86.

This Court hereby issues its Initial Report and Recommendation regarding Wallace's Motion to Suppress. Dkt. 51. For the reasons below, Wallace's Motion to Suppress should be **GRANTED**. 28 U.S.C. § 636(b)(1)(B).

## II.    FACTUAL HISTORY

The following facts are drawn from audio recordings of law enforcement interviews, from police reports, and from evidentiary hearings. Def. Ex. D-2, D-3, D-5; Gov. Ex. 2, 3; Dkt. 61-1; Dkt. 72; Dkt. 73.

## A. The Relationship

Some time around December 2019, Brian Butler and Ryann Hobert struck up a "kind of a weird relationship" when they met at a dancing nightclub that Hobert worked at as a professional dancer. Dkt. 61-1 at 17; Def. Ex. D-2 at 01:06-01:47, 03:11-03:48. An unusual element existed in the relationship because there was a notable difference in age between the two, and in Hobert's eyes, Butler was both a "father figure" and a "sugar daddy." Dkt. 61-1 at 17; Def. Ex. D-2 at 03:11-03:48. Butler, for his part, had provided financial and emotional support throughout the relationship because he worried about Hobert. Def. Ex. D-2 at 03:11-03:48. Butler had invited Hobert, on several occasions, to stay overnight at his home in Sterling. Def. Ex. D-2 at 04:53-05:08, 16:31-17:30; Dkt. 77 at 10. Butler's home was a two-story dwelling. The first floor was used for a home business. The second floor, located above the garage, was a residential apartment. Def. Ex. D-2 at 00:40-01:05; 04:53-05:08; Dkt. 77 at 10. Hobert believed that a high volume of people visited or stayed at Butler's residence for short periods of time, including Tammy Roseberry, who was also employed as a professional dancer at the same nightclub where she and Butler had met. Dkt. 61-1 at 17. Roseberry had, at some point, traveled out of state and stored several of her personal belongings in Butler's second-floor apartment. Def. Ex. D-2 at 16:15-17:30.

In September 2020, Hobert contacted Butler for financial assistance on behalf of a friend that wanted to relocate to Alaska from Arizona to escape personal difficulties. Dkt. 77 at 11; Dkt. 61-1 at 7; Dkt. 77 at 10-11. Butler did not know Hobert's friend, now identified as Shelby Rodriguez, but nonetheless agreed to help. Def. Ex. D-2 at 03:04-03:10, 05:42-05:55; Dkt. 77 at 11-12. Butler provided Hobert with access to his commercial airline account, Hobert purchased Rodriguez's airplane ticket, and Rodriguez arrived in Anchorage sometime in September. Dkt. 61-1 at 7; Dkt. 77 at 11. On October 6, Butler and Hobert arranged a two-night stay at his Soldotna home so Butler could meet Rodriguez. Def. Ex. D-2 at 01:06-01:47; 05:42-05:55; Dkt. 61-1 at 7, 17; Dkt. 77 at 9-10.

## B. Butler's Residence

Butler agreed to pick them up from the Ramada Inn Hotel since Butler was already in Anchorage and Hobert did not have the resources needed to travel. Def. Ex. D-2 at 06:16-06:52; Dkt. 61-1 at 7; Dkt. 77 at 45-46. Butler knew that Hobert had been living at the Ramada Inn Hotel "for the past couple of months." Def. Ex. D-2 at 05:56-06:15; Dkt. 77 at 46-47. After making the two-and-a-half-hour ride to Sterling, Hobert and Rodriguez stayed in the second floor apartment, and were told they could "use anything upstairs." Dkt. 61-1 at 17. Butler noticed, at some point during this stay, that Rodriguez was wearing an item of clothing owned by Roseberry but acquiesced to Rodriguez wearing the item. Def. Ex. D-2 at 09:24-10:40; Dkt. 61-1 at 7. Butler knew that Hobert and Rodriguez were scheduled to be picked up by a man named "Cash," in the early morning hours of October 8. Def. Ex. D-2 at 01:06-01:47, 07:20-8:50, 18:33-18:45; Dkt. 61-1 at 7; Dkt. 77 at 11. According to Butler, Cash lived in Coopers Landing, but worked as a front desk

receptionist at the Anchorage-based Ramada Inn Hotel and was therefore able to drive them back to Anchorage. Def. Ex. D-2 at 07:20-8:00; Dkt. 77 at 43-44. Hobert's recollection of Cash diverged from Butler's. Dkt. 61-1 at 18. "Cash" was actually "Bob" whom she met from Facebook, who lived in Coopers Landing, but was unemployed. Dkt. 61-1 at 18.

Butler observed them drive off after suitcases and laundry were loaded into Cash's Ford pick-up truck. Def. Ex. D-2 at 7:01-9:06; Dkt. 77 at 11, 42, 44.

## C. The Investigation

Eight days later, on October 16, Butler called law enforcement to report a possible theft after realizing that several of Roseberry's personal belongings were missing. Trooper Michael Henry was assigned to the case.[4] Def. Ex. D-2 at 00:00-00:40, 01:48-03:03; Dkt. 77 at 8-9, 42. Butler relayed his general knowledge of Hobert and the dynamics of their relationship to Trooper Henry. Def. Ex. D-2 at 00:00-00:40, 01:48-03:03. When asked why he believed Hobert was the potential suspect, Butler offered several reasons behind his suspicion: he had specified to Hobert what items belonged to Roseberry, the item of clothing that Rodriguez had worn was missing, there had been no other visitors inside the apartment since Hobert and Rodriguez, and none of Butler's personal items, some of them expensive, were missing. Def. Ex. D-2 at 04:53-05:08, 09:24-1045, 16:15-17:30; Dkt. 61-1 at 7; Dkt. 77 at 10. Butler did not have a definitive list of Roseberry's missing belongings, but he was sure that a laptop and several cameras were missing. Def. Ex. D-2 at 13:50-

---

[4] *Trooper Henry has since been promoted to Patrol Sergeant. This Court will identify Sergeant Henry as Trooper Henry for efficiency purposes. Dkt. 77 at 6.*

16:15. Trooper Henry requested that Butler not call Hobert until a search warrant to monitor their telephone communications was granted. Def. Ex. D-2 at 13:37-13:49, 22:15-25:30.

Trooper Henry spoke with Roseberry that same day and amassed a list of stolen items: camera and equipment valued around $6,000; a Macbook laptop, a hard drive; about $2,000 in cash; distinct crystals and crystal balls; and several pieces of clothing. Dkt. 61-1 at 7; Def. Ex D-3 at 00:10-00:37, 02:31-02:50. Butler called Trooper Henry again and relayed that Hobert was still living at the Ramada Inn. Def. Ex D-3 at 00:38-00:48, 02:25-02:55; Dkt. 77 at 47. Butler explained that he called Ramada Inn's front desk from a blocked phone number, asked to leave a message for Hobert, and a woman employee then answered, "oh yeah, yeah, she's here, she's not in the room right now but still here." Def. Ex. D-3 at 00:49-01:19; Dkt. 77 at 49. Trooper Henry stressed to Butler that the investigation was in its early stages of collecting information, but that "it sure looks like that [Hobert] probably took it or the other girl took it." Def. Ex. D-3 at 01:20-02:30.

On October 17, pursuant to search warrant, Trooper Henry planned with Butler to intercept and record a phone conversation, between Butler and Hobert. Dkt. 61-1 at 7. The recorded conversation never took place, as Hobert did not respond to Butler's phone calls or text messages. Dkt. 61-1 at 7.

On October 19, there was a call between Trooper Henry and Butler. Gov. Ex. 2. The sum and substance of the phone call was based on what Rodriguez mentioned to Butler about Hobert, who, in turn, was relaying it back to Trooper Henry. Gov. Ex. 2. Butler verified that he had traveled to Anchorage, that he had located Rodriguez at the Ramada

Inn, and had several updates from sleuthing around the Ramada Inn. Gov Ex. 2 at 00:20-01:20. Butler first mentioned that Rodriguez had been "really, really mad" because Hobert had "dumped" Rodriguez at the Ramada Inn with a password-locked Macbook laptop. Gov Ex. 2 at 00:31-01:20; Dkt. 77 at 27. Butler was "leaning towards believing" Rodriguez's statements that Rodriguez had been duped into being a part of Hobert's premeditated plan of theft, because Hobert had "done stuff like this before to her, she said that's why they weren't friends for like two years." Gov Ex. 2 at 05:13-05:46; Dkt. 77 at 27. In other words, Rodriguez knew Hobert "and all her flaws." Gov. Ex. 2 at 05:13-05:46. Rodriguez, according to Butler, pointed out that Hobert had sent Rodriguez "down in the kitchen" in the early morning hours of October 8, to "sit down there with [Butler] for a while. So [Hobert] can gather all that stuff up, that has to be the reason. When they were ready to go, [Hobert] had everything packed including [Rodriguez's] stuff, ready to go." Gov Ex. 2 at 04:07-05:00; Dkt. 77 at 26. This gave Hobert, in Butler's eyes, about three to four hours to possibly pack the stolen items while Rodriguez distracted Butler with conversation. Gov Ex. 2 at 05:01-05:12; Dkt. 77 at 26.

When asked about the Macbook laptop, Rodriguez mentioned to Butler that Hobert had tried and failed to log into the computer several times, and Hobert "got into the vehicle that had come down here to pick them up … and [Rodriguez] has not talked to her since and can't find her." Gov Ex. 2 at 01:21-01:33, 02:27-02:40; Dkt. 77 at 27. Rodriguez returned the Macbook laptop to Butler, and Butler then "looked all over that room in the Ramada and nothing else was there." Gov Ex. 2 at 05:47-06:08. Rodriguez did not know the driver from October 8 but she did know "the guy that [Hobert] is hanging out with right

now. All she knows is the first name is Anthony, Tony. [Hobert] calls him Tone, he's got a pretty good criminal history, I guess." Gov. Ex. 2 at 02:41-03:27; Dkt. 77 at 27-28. Butler went on to mention that Hobert had been with "him for four to five months and is pregnant by him. Calls him Tone, and he's a [B]lack dude, and a criminal history, and I think [Rodriguez] might have said he's on parole or something." [sic]. Gov Ex. 2 at 03:28-04:06; Dkt. 77 at 27-28. Rodriguez had some knowledge that Hobert had been staying at the Extended Stay Hotel on 8th Street but had failed to get in contact with Hobert after allegedly visiting several times. Gov. Ex. 2 at 01:34-02:07; Dkt. 77 at 28.

Butler, without being asked, stated that Hobert shared a storage unit at Ship Creek Storage on Ship Avenue, with a friend, or possibly a biological brother, named Chad Anderson. Gov. Ex. 2 at 08:30-11:00. The storage unit would most likely be rented under Anderson's name. Gov. Ex. 2 at 11:05-11:30. Anderson, according to Butler, was known to steal "cars for a living" and was Hobert's "partner in crime." Gov. Ex. 2 at 08:51-09:04. Butler had visited this storage unit several times before, with the most recent visit sometime in January or February 2020. Gov. Ex. 2 at 08:30-11:00, 11:31-12:10. Hobert "had it for a while, and you might probably find some stuff over there, wouldn't surprise me one bit." Gov. Ex. 2 at 11:05-11:30. Butler stated to Trooper Henry that he had scheduled to pick Rodriguez up later in the day after she vacated the Ramada Inn room. Gov. Ex. 2 at 02:10-02:27.

Butler also spoke with an unidentified Ramada Inn employee who was aware of "everything that happened because [Butler had] told him." Gov. Ex. 2 at 06:45-07:20. Trooper Henry, at this juncture, opted to amend his previous search warrant to monitor

communications to include Rodriguez. Gov. Ex. at 13:35-14:15. Trooper Henry replied in the affirmative when Butler mentioned that the conversation was recorded and asked if it was of value to Trooper Henry. Gov. Ex. 2 at 04:07-05:00, 12:13-13:10. Plans were made to transfer the audio recording later that day. Gov. Ex. 2 at 12:13-13:10. The audio recordings had additional pieces of information, relevant among them, was that the Macbook laptop had been reconfigured with a username associated with Rodriguez. Dkt. 61-1 at 10; Dkt. 78 at 50-51.

Trooper Henry called the Extended Stay Hotel on 8th Street and was able to verify that no hotel room was registered under Hobert's name. Dkt. 61-1 at 9.

On October 20, Trooper Henry returned another of Butler's phone calls. Gov. Ex. 3. Butler had again spoken with Rodriguez on October 19. Gov. Ex. 3 at 00:10-00:35. Butler appeared to be somewhat suspicious of Rodriguez because he stated that Rodriguez had been saying "all the right things or is a very good actor, which is entirely possible, I guess." *Id.* at 00:50-00:57. Rodriguez, according to Butler, reiterated the general descriptive details of Hobert's possible significant other, specifically that "this guy is on a ankle monitoring thing [*sic*] … And I think he goes by the name Tone." Gov. Ex. 3 at 01:30-2:00; Dkt. 77 at 28. The next step in Trooper Henry's investigation was to "find them … I actually called over the Extended Stay yesterday, and there was nobody, no reservation in Ryann's name. Which is not that surprising to me, it's probably in his name." *Id.* at 02:01-02:55. Trooper Henry stated that the general descriptive details, specifically the ankle monitoring bit, would possibly narrow the pool of potential suspects. *Id.* at 02:55-03:05.

The conversation turned to Hobert's storage unit. *Id.* at 03:06-03:10. Butler concluded himself that the storage unit was not a credible lead, and to basically "forget about that, there's no storage unit at Ship Creek" because Butler ran three specific names (Anderson, Hobert's mother, and Hobert) by the storage unit employee; and the employee apparently replied that Hobert's "mother closed her account in the Spring." *Id.* at 03:11-04:19. Despite these declarations, Butler was adamant that Hobert "still has a storage unit up there … I don't know where." *Id.* at 04:20-04:40. Trooper Henry was "pretty interested when [Butler] mentioned that storage unit. We recover a lot of stolen stuff from storage units." *Id.* at 04:38-04:50. Near the end of the conversation, it appeared that Trooper Henry did not believe that Butler's audio recordings were a high priority, despite the haste of the investigation, because Trooper Henry planned to obtain the recordings in two days time. *Id.* at 05:00-05:50.

It is unclear whether Butler and Trooper Henry met in person when Butler "sent" the two audio recordings, that had file names and time stamps, on October 22. Dkt. 61-1 at 10; Dkt. 78 at 36-37.

A separate part of Trooper Henry's investigation was researching and inspecting Hobert's Facebook account. Dkt. 61-1 at 9. Although the primary name on the Facebook account appeared to be "Rice Marley," there was also "her legal name of Ryann Hobert [also] listed on the account." *Id.* Trooper Henry then turned to the Department of Corrections website to research the general descriptive details provided by Butler and found "a [B]lack male in Anchorage named Antonio Wallace [who] was currently on electronic monitoring (ankle monitoring). As one of his emergency contacts he had listed

Rice Hobert. On 10/20/20 at about 1240 hours, the ankle monitor showed Wallace's location to be at the Extended Stay Hotel located at 700 E. 34th Avenue in Anchorage." *Id.* at 9, 13. Wallace owned a gold Chevrolet four-door vehicle. *Id.*

### D. SW 172, The Hotel Room

SW 172 was supported by the affidavit of Trooper Henry. Dkt. 51-1. After describing the specific items missing, Trooper Henry described his qualifications and law enforcement experience. *Id.* at 5-7. Relevant here is that the affidavit did not include every known fact but maintained that it was an accurate narrative of the "primary facts." *Id.* at 6. Trooper Henry then described his investigative findings:

- Hobert and Rodriguez stayed at Butler's residence from October 6-8;
- Butler noticed, on October 16, that several of Roseberry's personal belongings were missing;
- Trooper Henry called Roseberry and collected a list of missing belongings;
- One of the missing items was a piece of clothing that Butler had allowed Rodriguez to wear;
- Hobert had a "last known address in Anchorage, AK";
- Butler had recovered the Macbook laptop from Rodriguez after Butler found Rodriguez at the Ramada Inn;
- Rodriguez had been left at the hotel after Hobert failed to log into the Macbook laptop, that Hobert left the laptop with Rodriguez, "and Hobert left again with the man that drove them to Anchorage, along with the rest of the stolen property";
- Butler had searched Rodriguez's hotel room and came up empty;
- Since Rodriguez had not spoken with Hobert since October 8, "the last [Rodriguez] knew, [Hobert] was staying at the Extended Stay hotel on 8th Street in Anchorage.";
- Rodriguez had stated that Hobert was "hanging out with a guy named Anthony" or "Tone. He's a [B]lack guy with a criminal history and [Rodriguez] thinks he's on parole."
- Hobert did not drive and did not own a vehicle;
- A further conversation with Rodriguez revealed that Hobert's associate she knew as Anthony or Tone, is a [B]lack male and he's on ankle monitoring currently."

- "An open source internet search revealed Ryann Hobert has a facebook [sic] account and her name on the account is 'Rice Marley', though her legal name Ryann Hobert is also listed on the account. A check of Department of Corrections records revealed a [B]lack male in Anchorage named Antonio Wallace was currently on electronic monitoring (ankle monitor). As one of his emergency contacts he has listed Rice Hobert. On 10/20/20 at about 1240 hours, the ankle monitor showed Wallace's location to be at the Extended Stay Hotel located at 700 E. 34th Avenue in Anchorage, AK.";
- Wallace owned a gold Chevy four-door vehicle and that it was observed at the Extended Stay's hotel parking lot;

[*sic*]. *Id.* at 6-9 (some internal quotations omitted).

**E. SW 173, Wallace's Vehicle**

SW 173 was supported by the affidavit of Trooper Henry which largely tracked the SW 172 affidavit. Dkt. 51-4. The following are new details not found in the SW 172 affidavit:

- "Based on the information above that [Hobert] is now known to have her own vehicle, and she is known to be staying with Wallace, and based on my experience knowing people who are staying in hotels often store some of their property in their vehicle, and based on my training and experience that people who steal property often store stolen property in their vehicle, there is probable cause to believe some of the stolen property stolen by [Hobert] would be located inside Wallace's vehicle."

**F. Executing Search Warrants and Interrogation**

Law enforcement officials executed both search warrants in the late morning of October 21. Dkt. 61-1 at 16; Dkt. 78 at 70-71. As to SW 173, law enforcement officials seized a firearm found under the driver's seat of Wallace's vehicle. Dkt. 61-1 at 4. The SW 172 search produced different results. Law enforcement officials found another firearm underneath a bed and materials generally used for controlled substance purposes. Dkt. 51-

12

6 at 3; Dkt. 61-1 at 15-16. Although the firearm was not included in the search warrant, the firearm under the bed was nonetheless seized because of its "proximity to the safe." Dkt. 78 at 83. Law enforcement also observed a significant amount of methamphetamine and currency through the mounting holes of a safe. Dkt. 61-1 at 17; Dkt. 51-6 at 3; Dkt. 78 at 63.

After being handcuffed, Hobert stated, among other things, that she was aware of recent interactions between Butler and Rodriguez. Dkt. 61-1 at 17; Dkt. 78 at 60-61, 72-73. Wallace was interrogated in a separate bedroom. Dkt. 61-1 at 17; Dkt. 78 at 64-65. Sergeant Chaffin first read Wallace his *Miranda* rights, Wallace verbally indicated that he understood his *Miranda* rights, and Wallace answered a couple of background questions before the interview turned to the safe. Def. Ex. D-5 at 00:30-04:40; Dkt. 78 at 66-67. Sergeant Chaffin wanted Wallace "to be straight up with [him]. I want to work with you, to sort of get past this." Def. Ex. D-5 at 04:41-04:50. Sergeant Chaffin then asked Wallace to explain the contents of the safe, and Wallace at first, stated that there was nothing of particular value inside except personal items or currency. *Id.* at 04:51-05:19. Wallace asked if Sergeant Chaffin "had no clue" as to the contents of the safe, and Sergeant Chaffin answered: "we're probably gonna. I haven't opened it yet. But I can see through the back of the hole of safe, so that's why I want to give you an opportunity to get ahead of this … and we can work through it, and I got options to work with you but I can only work with you if you're honest with me and I can trust you. The bottom line is that we're eventually getting into the safe … we're gonna run fingerprints. It is what it is. We can't change that.

And you can sit here and tell me there's nothing in there … the only thing that changes is the level of trust that I have in you." [*sic*]. Def. Ex. D-5 at 05:21-06:01; Dkt. 78 at 67.

Wallace, at this juncture, appeared to ask if "he should get a lawyer first" but Sergeant Chaffin declined to proffer legal advice. Def. Ex. D-5 at 07:00-07:30; Dkt. 78 at 68. Sergeant Chaffin acknowledged that law enforcement was already in the process of applying for a search warrant, but that Wallace's honesty and cooperation could expedite the investigative process. Def Ex. D-5 at 08:20-08:50; Dkt. 78 at 81. Sergeant Chaffin reiterated that he would not proffer legal advice, but that Wallace's cooperation could potentially mitigate his legal situation, since "that's the only way [Sergeant Chaffin] could do anything." Def. Ex. D-5 at 08:51-09:50. Wallace's voice was filled with trepidation when he stated that "you're gonna bust it open anyways … I just feel like if that's necessary for the search warrant." [*sic*]. Def. Ex. D-5 at 10:00-10:31; Dkt. 78 at 69. Wallace conceded that he had $13,000 collected from unemployment checks. Def Ex. D-5 at 10:40-11:55. Perhaps sensing Wallace's trepidation, Sergeant Chaffin bluntly asked, "Will you be straight up with me, how much meth do you have in the safe?" Def Ex. D-5 at 11:56-12:06; Dkt. 78 at 80. Wallace sounded momentarily overwhelmed by the question, but within seconds, answered that there was probably "one or two" pounds of methamphetamine. Def Ex. D-5 at 11:56-12:06; Dkt. 78 at 69. Sergeant Chaffin did not want Wallace to "feel coerced" into opening up the safe, but Wallace again quickly indicated where the keys were located. Def. Ex. D-5 at 12:45-14:30.

**G. SW 3952, The Methamphetamine and Firearm**

SW 3952 was supported by the affidavit of Investigator Richard Chambers. Dkt. 51-6. After describing his qualifications and law enforcement experience, Investigator Chambers stated the following:

- An "existing search warrant authorized the search for stolen property in an unrelated burglary investigation. During the course of that search investigators located a bulk quanity [*sic*] of jewelers [sic] baggies and a digital scale with what appears to be methamphetamine residue and a safe in the bedroom of the hotel room. A closer inspection of the safe, revealed that it was locked; however, investigators could see a plastic bag through a hole in the back of the safe with what investigators believe to be several ounces or pounds of methamphetamine with a bulk amount of currency;
- Written on the margin is that Trooper Chaffin identified the methamphetamine and currency "in the opened safe, after typed affidavit was written";
- The search warrant requested to seize the several quantities of controlled substances found and related accessories.

*Id.* at 2-3.

## III.    EVIDENTIARY HEARING

### A. Testimony of Trooper Henry

Trooper Henry testified that he had written hundreds of search warrants throughout his law enforcement career. Dkt. 77 at 35. The first section of every search warrant contained, among other things, a statement that he was "not including each and every detail of the investigation known to [him], but it's an accurate summary of the pertinent details." Dkt. 77 at 37; Dkt. 78 at 16. The determination of what to include in every search warrant was two-fold: (1) provide the pertinent details, and (2) include "any exculpatory evidence … that would tend to reflect that this suspect or person of interest in my care, maybe was

not involved or that this location is not the location. But essentially relates mainly to the person involved typically." Dkt. 77 at 37.

The first step in his investigation was to execute a search warrant to monitor communications in an effort to collect more information. *Id.* at 16, 21-22, 51. Trooper Henry initially believed that Hobert, and not Rodriguez, was the primary suspect of the investigation. *Id.* at 13, 15, 19, 21. The familiarity between the two was important because Butler would be able to "play on that information to get information from her versus [Rodriguez] who he doesn't really know. There's not as much motivation perhaps for her to be truthful with him. But also simply we didn't [have] a way to call" Rodriguez. *Id.* at 15, 58. This "calculated risk," however, resulted in a dead end because Hobert did not reply to Butler's communications. *Id.*

Ramada Inn was a plausible lead in part because Hobert's "location was unknown" at the time, and in his experience and training, registered addresses in law enforcement databases were often inaccurate. Dkt. 77 at 12-13; Dkt. 78 at 22-23. Despite that, Trooper Henry did not believe that it was his duty to investigate and call the "Ramada Inn because [Butler] had just called them." Dkt. 77 at 22. Trooper Henry admittedly did not know the extent of Butler's investigation or phone calls with the Ramada Inn. Dkt. 78 at 48. Trooper Henry was also unsure "if the stolen property may [have been] in a mix of locations." *Id.* at 50, 53. Perhaps more importantly, Trooper Henry wanted to avoid tipping off Hobert because, had he called, Cash would have blown his cover. *Id.* at 52.

The second step was to identify Roseberry's belongings by collecting photographs and serial numbers. *Id.* at 16-17. The third step, according to Trooper Henry, was to contact

the Anchorage law enforcement office to request resources in the event that a search warrant was granted. *Id.* at 22, 51.

The fourth step in Trooper Howard's investigation began when he fielded Butler's phone call on October 19, when Butler had traveled to Anchorage. *Id.* at 23. Butler, according to Trooper Henry, "did a hard look around the [hotel] room" but only recovered the Macbook laptop. *Id.* at 24, 26, 28-30, 54, 57. On further reflection, Trooper Henry might have "wrongly assumed" that Hobert was no longer on the premises of Ramada Inn, since Butler did not inquire into whether the room was shared by both women. Dkt. 77 at 29-30, 57, 61; Dkt. 78 at 42-42. Despite Rodriguez being in possession of the Macbook laptop, and possibly being a "co-conspirator" that implicitly admitted culpability, Trooper Henry nonetheless maintained that Rodriguez was not a viable suspect. Dkt. 77 at 54-55, 61; Dkt. 78 at 32-33. The investigation instead took a different turn when Rodriguez, according to Trooper Henry, stated that "she knew that [Hobert] had been staying with this Tone guy at the Extended Stay hotel in Anchorage on -- I think it was 8th Avenue." Dkt. 77 at 28-29; Dkt. 78 at 5. Rodriguez's information regarding "Tone's" ankle monitoring was a distinctive piece of information that allowed law enforcement to partially match the other general descriptive details to Antonio Wallace. Dkt. 77 at 31; Dkt. 78 at 5. When law enforcement checked Wallace's ankle monitor location, it showed that Wallace was at the Extended Stay Hotel on 34th Avenue. Dkt. 77 at 31.

Regarding the Rice Marley name on Facebook, Trooper Henry had concluded that it was a combination of "the pseudonym with the real name of Ryann Hobert that was a consistency, a corroboration that this Antonio Wallace was likely associated with Ryann

Hobert." *Id.* at 32. Trooper Henry testified that he had not investigated the date of the emergency contacts list. Dkt. 78 at 8. When asked about the Ship Creek Storage as a possible lead, Trooper Henry deferred to the findings of Butler's investigation, particularly that Hobert's "unit was closed out." Dkt. 77 at 33; Dkt. 78 at 19, 21-22. Trooper Henry had relied on Butler's information because Butler was an "extremely motivated" witness. Dkt. 78 at 47. Trooper Henry again deferred to Butler's knowledge of Hobert when Butler mentioned that Hobert did not own a vehicle. Dkt. 77 at 34. This piece of knowledge triggered Trooper Henry's experience and knowledge that suspects "hide property in an investigation inside a vehicle. Especially if you're staying at a hotel. It's even that much more likely you might have items related to the investigation inside a vehicle." Dkt. 77 at 34-35; Dkt. 78 at 49-50.

Trooper Henry revealed, on cross-examination, that he had separately charged Hobert in June 2020, and in these charging documents were two residential addresses that he had familiarity with. Dkt. 78 at 23-25. Trooper Howard became non-responsive throughout this line of questioning, falling back on his previous theory that registered addresses were inaccurate. Dkt. 78 at 28-31. Despite authoring the charging documents, Trooper Henry professed that the June 2020 address was "not something that I had any awareness of at the time of writing these warrants that I can recall, But, yes, that address exists." Dkt. 78 at 27. Moreover, Trooper Henry conceded that he was aware that, contrary to his affidavit's statement, Wallace was not the same driver that picked them up from Butler's residence on October 8. *Id.* at 33-34. Trooper Henry repeatedly insisted that he

was unaware of this distinction because he had "learned about that after [he] wrote these search warrants." *Id.* at 35-38.

## IV.  LEGAL ANALYSIS

### A. Legal Standard

The Warrant Clause of the Fourth Amendment "provides that a Warrant may be issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "A search warrant is supported by probable cause if the issuing judge finds that, given all the circumstances set forth in the affidavit before him" indicate that a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States. v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (internal quotations omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A warrant application may, as is the case here, rely on hearsay from an informant to establish probable cause. *See Gates*, 462 U.S. at 241-42; *see also e.g.*, *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004). The same totality-of-the-circumstances analysis applies, although particularly relevant are the informant's veracity, reliability, and basis of knowledge. *Id.*; *Id*. An affidavit cannot rely on "wholly conclusory statements" that probable cause exists based on the affiant's mere belief, "without detailing any of the underlying circumstances upon which that belief is based." *United States v. Ventresca,* 380 U.S. 102, 108–09 (1965) (internal quotations omitted); *see also Gates*, 462 U.S. at 239 ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and ... wholly conclusory statement[s] ... fail to meet this requirement."); *see also United States*

*v. Dubrofsky,* 581 F.2d 208, 212 (9th Cir. 1978) ("A search warrant may not rest upon mere affirmance or belief without disclosure of supporting facts or circumstances.").

Search warrants must avoid staleness and establish a reasonable nexus. *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006); *United States v. Grant*, 682 F.3d 827, 835, 839 (9th Cir. 2012). The staleness inquiry turns on whether "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *Grant*, 682 F.3d at 835 (quoting *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997)). Mere lapse of time is not a decisive factor. *See, e.g., United States v. Alvarez,* 358 F.3d 1194, 1203–04 (9th Cir. 2004) (rejecting staleness argument because three-year-old information was corroborated by evidence of recent telephone communications with co-conspirators); *see also United States v. Vaandering,* 50 F.3d 696, 700 (9th Cir. 1995) (finding twenty-two month old information not stale when "the older information was coupled with recently obtained information"). The facts must instead indicate that the evidence is known to be at the location to be searched "so recently as to justify the belief that the property is still there at the time of the issuance of the search warrant." *Grant*, 682 F.3d at 835 (quoting *Durham v. United States*, 403 F.2d 190, 194 (9th Cir. 1968)).

Affidavits also require a reasonable nexus between the evidence and the targeted location to be searched. *United States v. Crews*, 502 F.3d 1130, 1136-37 (9th Cir. 2007); *see also Grant*, 682 F.3d at 839, 841; *see also Underwood*, 725 F.3d at 1082-83 (reasoning that although this description is a sufficiently detailed factual allegation, it lacks a nexus with ecstasy trafficking and therefore does not support the conclusion that Underwood is a

ecstasy trafficker.); *see also Warden v. Hayden,* 387 U.S. 294, 307 (1967) (reasoning that the Fourth Amendment requires "a nexus ... between the item to be seized and criminal behavior.").

Evidence acquired in violation of the Fourth Amendment must be excluded unless "Fourth Amendment interests will [not] be advanced" by the application of the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 915-16 (1984). Suppression is specifically appropriate if law enforcement officials demonstrate deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. *Id.* (citing *Herring*, 555 U.S. at 144). In contrast, when the police act with an objectively reasonable good-faith belief that their conduct is lawful then "the deterrence rationale loses much of its force" since exclusion cannot pay its way. *Id*. In such cases, the good-faith exception, first set forth in *Leon*, 468 U.S. at 897, applies and exclusion is therefore not warranted.

Under the good-faith exception, "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" may be exempt from the exclusionary rule. *Leon*, 468 U.S. at 922. This turns on "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23) (internal quotations omitted). However, there are four circumstances where the good-faith exception is inapplicable: (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliability upon it unreasonable; and (4) where the warrant

is so facially deficient that reliance upon it is unreasonable. *United States v. Elmore*, 917 F.3d 1068, 1076-77 (9th Cir. 2019); *see also Underwood*, 725 F.3d at 1085.

The first circumstance above is similar to the "bulwark of Fourth Amendment protection" that requires "police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). Different rules apply when a Magistrate Judge's probable cause determination may have rested on false or misleading information. If a defendant's "allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence" at a *Franks* hearing, "and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156.

The first *Franks* step requires that a defendant show that the affiant intentionally or recklessly made misleading statements or omissions. *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017). In the context of omissions, "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985), *amended by* 769 F.2d 1410 (9th Cir. 1985). To do so would "effectively usurp … the magistrate's duty to conduct an independent evaluation of probable cause." *Perkins*, 850 F.3d at 1118; *see also United States v. Johns*, 948 F.2d 1131, 1133 (9th Cir. 1988) (omitting facts that cast doubt on the existence of probable cause makes such omissions material); *United States v. Flores*, 679 F.2d 173, 177 n.1 (9th Cir. 1982) ("A magistrate cannot adequately determine the existence of probable

cause with the requisite judicial neutrality and independence if the police provide him or her with a false, misleading, or partial statement of the relevant facts."). However, an affiant's "negligent or innocent mistake does not warrant suppression." *Perkins*, 850 F.3d at 1116.

The second *Franks* steps requires that a defendant show that the misleading statement or omission was material, or in other words, necessary to the probable cause determination. *Perkins*, 850 F.3d at 1119. The "key inquiry is whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions." *Id*. (quoting *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014)) (internal quotations omitted). An omission or misstatement is material if it would "cast doubt on the existence of probable cause." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) (quoting *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992)).

## B. SW 172 and SW 173

To begin with the first *Franks* step, Wallace has established by a preponderance of the evidence that Trooper Henry misled the Magistrate Judge by (1) recklessly stating that Hobert "left again with the man that drove them to Anchorage, along with the rest of the stolen property"; (2) by recklessly omitting that Butler had called the Ramada Inn, a known location associated with Hobert, and received some verification that Hobert was living or was located at the Ramada Inn on October 16; (3) and by recklessly omitting the Ship Creek storage unit as a plausible lead that, taken together with Trooper Henry's experience

that storage units were known to store stolen items, would have cast doubt on Wallace's vehicle and hotel room as possible locations of the stolen items.

On October 16, Butler mentioned to Trooper Henry that a man named "Cash" picked up the two women on October 8. Def. Ex. D-2 at 01:06-01:47, 07:20-8:50, 18:33-18:45; Dkt. 61-1 at 7; Dkt. 77 at 11. On October 19, Butler relayed Rodriguez's statements that she did not know the name of the October 8 driver but that she knew who Hobert was "hanging out with right now." Rodriguez's statement therefore made a clear distinction that Wallace was not the October 8 driver. Despite these two pieces of information from two different phone calls, Trooper Henry was adamant that it was after writing the search warrants that he had learned that Wallace was not the October 8 driver. Trooper Henry's testimony, on this point, is frankly not persuasive. The affidavits' narrative created an implied association of the alleged theft with Wallace when the affidavits stated that she "again left with the man," that Hobert was "hanging with a guy named Anthony," and because Hobert did not drive or own a vehicle, the stolen items would be "inside Wallace's vehicle" or in the hotel room where "Wallace's car [was] parked." Trooper Henry's affidavit manipulated the inferences that the Magistrate Judge could draw because Trooper Henry reported "less than the total story." *Stanert*, 762 F.2d at 781.

Regarding the reckless omissions, Trooper Henry had received information that reasonably indicated a fair probability that the evidence sought remained in either the Ramada Inn or the Ship Creek storage unit. Indeed, Trooper Howard was "pretty interested when [Butler] mentioned that storage unit. We recover a lot of stolen stuff from storage units." Taken together with the fact that Butler had previously visited this storage unit and

was adamant that Hobert "still has a storage unit up there," despite his alleged findings from his own "investigation," Trooper Henry should have exercised greater diligence in corroborating information in his investigation. More to the point, the Magistrate Judge was unaware of these two important locations because Trooper Henry did not include them in his affidavits. Trooper Henry therefore "effectively usurped the [Magistrate Judge's] duty to conduct an independent evaluation of probable cause." *Perkins*, 850 F.3d at 1118-19.

Turning to the second *Franks* step, this Court first notes that the credibility of the source of information is particularly relevant when the affidavit's information consisted of several layers of hearsay. *Alvarez*, 358 F.3d 1194, 1203; *see also Ventresca,* 380 U.S. at 108–09; *see also Gates*, 462 U.S. at 239; *see also Dubrofsky*, 581 F.2d at 212. What is problematic about Trooper Henry's affidavits is the lack of information establishing Rodriguez's veracity:

- Trooper Henry knew or had reason to know that Butler had little to no knowledge of Rodriguez's reliability;
- All that Butler knew about Rodriguez, prior to the October overnight stays, was that she traveled to Anchorage to escape out-of-state personal troubles;
- Trooper Henry knew that Butler had expressly mentioned that one of Roseberry's missing belongings was last worn by Rodriguez;
- The first plausible lead in Trooper Henry's investigation came from Butler finding the Macbook Laptop in Rodriguez's hotel room;
- Butler twice indicated to Trooper Henry that he had some doubts as to the veracity and reliability of Rodriguez's statements;
- Trooper Henry testified that Rodriguez did not have "as much motivation perhaps for her to be truthful with" from the start since she was possibly a "co-conspirator" that admitted culpability.

In addition, Rodriguez's possible motives are difficult to assess since the affidavits do not elaborate on what Rodriguez stood to gain from "candidly" speaking with Butler.

Rodriguez was, after all, caught red-handed with one of the missing belongings. What is perhaps most concerning is that, aside from connecting Hobert to Wallace, there is virtually no independent corroboration mentioned in the affidavits. Trooper Henry offers three explanations for that deficiency: (1) his affidavits included a section that explained that he was not including each and every detail of the investigation known to [him]"; (2) he did not want to "tip off" or "ruin any investigative leads"; or (3) he otherwise believed they were irrelevant.

It is true that an affiant's narrative involves a component of selectivity and boilerplate language. *See e.g.*, *Grant*, 682 F.3d at 841 ("A reasonable officer would know that probable cause is not supplied by stating everything one knows about a particular item one would like to find to solve a murder case, if the mass of facts simply does not plausibly connect the place searched to the item sought."). To be sure, boilerplate language does not automatically void an affidavit, if the affidavit nonetheless supplies sufficient information for a probable cause determination. This Court stresses that, under these circumstances, the relevant boilerplate language cannot shield Trooper Henry from scrutiny because, again, he failed to provide the "pertinent details" of the two locations, and because he failed to independently corroborate the layers of hearsay information that came from a possible co-conspirator with questionable veracity. Moreover, this Court agrees with Wallace that the "cat was … already out of the bag" because Butler had questioned the possible co-conspirator on October 19, and had spoken with two Ramada Inn employees as to Hobert's possible whereabouts. Any reasonable concern of "tipping off" Hobert had dissipated by October 19. Indeed, Hobert mentioned that she had been *aware* of Rodriguez and Butler's

October 19 interactions. Dkt. 61-1 at 17. The aforementioned misstatement and omissions were therefore necessary to the probable cause determination. This Court also notes that, on these grounds, *Leon*'s good-faith exception is categorically inapplicable as to SW 172 and SW 173. *See Elmore*, 917 F.3d at 1076-77; *see also Underwood*, 725 F.3d at 1085.

In an abundance of caution, this Court will conduct a probable cause analysis with a corrected affidavit to fully determine whether the misleading statement and omissions "casted doubt on the existence of probable cause," or along the same lines, whether probable cause existed in the search warrants to begin with. *See Crow*, 608 F.3d at 435; *Perkins*, 850 F.3d at 1119 (quoting *Ruiz*, 758 F.3d at 1149).

Turning to probable cause, this Court first agrees with the government that the affidavit contained sufficient probable cause to determine that Hobert was a likely suspect in Trooper Henry's investigation. *Gates*, 462 U.S. at 238. Butler had an ample "basis of knowledge" of Hobert because Butler provided sufficient specificity when describing the history of the relationship, including the several overnight stays at Butler's residence. *Alvarez*, 358 F.3d at 1203. Butler also knew or had reason to know that Hobert was the likely suspect because he attested that "none of his property was stolen, only [Roseberry's] property[.]" It is true that eight days had lapsed after Butler realized that Roseberry's belongings were missing, but the affidavit dispelled any notion of staleness as to Hobert's possible culpability when it stated that Butler "recovered the Macbook Pro laptop from Rodriguez" on October 19. *Grant*, 682 F.3d at 835 (quoting *Lacy*, 119 F.3d at 746). The October 16 information regarding the October 8 theft, when coupled with the fact that the Macbook laptop was recovered from one of the October 8 guests, revived the probability

27

that the evidence sought would be present on Hobert's person or in a location sufficiently associated with Hobert. *See e.g.*, *Grant*, 682 F.3d at 835 (quoting *Durham*, 403 F.2d at 194); *see also Ventresca*, 380 U.S. at 108–09.

Wallace's concern regarding the general descriptive details, that led Trooper Henry to connect Wallace to his investigation, is well taken. The affidavit's statement that Wallace fit the general description of being "a [B]lack guy with a criminal history" would, on its own, fail to provide *any* reasonable basis to infer that Wallace was involved in the October 8 theft, because he happened to be a Black man. *Grant*, 682 F.3d at 833. It is important to remember at this juncture that probable cause does not set as high a bar as preponderance of the evidence. *Gates*, 462 U.S. at 235 ("explaining that "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place" in a probable cause determination and is instead a practical inquiry based on the totality of the circumstances.). The totality of the circumstances test is a "practical, nontechnical conception." *Id.* at 231. Relevant here is that Rodriguez, in the second October 19 phone call, provided a new piece of information that "Anthony or Tone" was possibly on "ankle monitoring." This piece of information allowed Trooper Henry's investigation to move forward by narrowing the pool of potential suspects. *Ventresca*, 380 U.S. 102, 108–09; *see also Dubrofsky*, 581 F.2d at 212. The affidavit further described that Trooper Henry's investigation revealed a general association between Hobert and Wallace. The affidavit indicated that "Rice" was a nickname associated with Hobert, a Black male named Antonio Wallace was on ankle monitoring, and in Antonio Wallace's emergency contact list was an association with "Rice

Hobert." Although Trooper Henry's investigation was imperfect, the general association is sufficient for probable cause purposes because Hobert's last name—a less common last name—matched the last name on Wallace's emergency contact list. On this point, compare the distinctiveness of Hobert's last name with the more quotidian "Anthony." The fact that Antonio, and not "Anthony," was Wallace's correct legal name is not a sufficient distinction to defeat a finding of probable cause because neither certainty, nor proof beyond a reasonable doubt, is required. *Hill*, 459 F.3d at 973.

It is here that the probable cause analysis for SW 172 and SW 173 ends in Trooper Henry's favor.

This Court, after careful consideration, concludes that the SW 172 and SW 173 affidavits failed to "establish a reasonable nexus between the crime or evidence and the location[s] to be searched." *Crews*, 502 F.3d at 1136-37; *see also Grant*, 682 F.3d at 827; *see also Underwood*, 725 F.3d at 1081 (explaining that probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place.") (quoting *Gates*, 462 U.S. at 238). This Court first notes that the government conceded (1) "that the pistol seized from Wallace's vehicle was not authorized by the [SW 173] warrant and there was no independent basis for its seizure"; and (2) that law enforcement did not consider Wallace as a suspect. The government's concessions are appropriate and well-taken by this Court.

Under the totality of the circumstances, the SW 173's affidavit's statement that "the stolen property stolen by [Hobert] would be located inside Wallace's vehicle" because Hobert was "known to be staying with Wallace" appears to be a wholly conclusory

statement. *See Ventresca,* 380 U.S. at 108–09; *see also Gates*, 462 U.S. at 239 ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and ... wholly conclusory statement[s] ... fail to meet this requirement."). As to SW 172, there was no reasonable nexus between Wallace's hotel room and evidence of theft. *Crews*, 502 F.3d at 1136-37; *Grant*, 682 F.3d at 836. There is also an element of staleness in SW 172. On the one hand, there was "sufficient basis to believe, based on a continuing pattern, or other good reasons" that Hobert might still be in possession of the evidence. *Grant*, 682 F.3d at 837-38 (quoting *Lacy*, 119 F.3d at 746). On the other hand, there was no "continuing pattern or other good reasons" for why the evidence would be in Wallace's hotel room. Here—similar to *Grant*—the missing items were "never known to be anywhere near" Wallace or Wallace's hotel room or that Rodriguez ever visited Wallace's hotel room; nor did the affidavit include evidence that suggested the items were in Wallace's hotel room after the October 8 theft, "much less close to the time the search occurred." Moreover, the association in the affidavit's statement that since Hobert "was staying at the Extended Stay Hotel on 8th Avenue," and "the ankle monitor showed Wallace's location to be at the Extended Stay Hotel" on 34th Avenue, is too attenuated to indicate that there would be a fair probability of finding the items in Wallace's hotel room. *See Underwood*, 725 F.3d at 1083.

This Court, after careful review, concludes that SW 172 and SW 173 were invalid warrants, the evidence seized pursuant to the invalid warrants must be suppressed, and *Leon*'s good-faith exception does not apply because the affiant recklessly placed false information in the affidavits that misled the issuing Magistrate Judge.

This Court now turns to whether Wallace's interrogation and consent were voluntary.

## C. The October 21, 2020 Interrogation

An involuntary confession is viewed as a guileful evil because there is a "deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320 (1959). Involuntary confessions are therefore inadmissible evidence under the Due Process Clause of the Fourteenth Amendment and under the Fifth Amendment right against self-incrimination. *See Dickerson v. United States,* 530 U.S. 428, 433 (2000); *see also Doody v. Schriro,* 548 F.3d 847, 858 (9th Cir. 2008). The overarching inquiry is whether a confession was "the product of an essentially free and unconstrained choice by its maker … The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Collazo v. Estelle*, 940 F.2d 411, 416-17 (9th Cir. 1991). There is, however, no "talismanic definition of voluntariness" that is "mechanically applicable," *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973), in part because as law enforcement "methods used to extract confessions [become] more sophisticated" a federal court's "duty to enforce federal constitutional protections does not cease." *Spano*, 360 U.S. at 321.

Voluntariness is instead determined in light of the totality of the circumstances. *Tobias v. Arteaga*, 996 F.3d 571, 581 (9th Cir. 2021). Relevant factors include the defendant's characteristics, the conditions and duration of the interrogation, whether the

statements were obtained by physical or psychological coercion, or by improper inducement so that the suspect's will was overborne. *Id.*; *see also Collazo*, 940 F.2d at 416-17 ("Interrogation tactics need not be violent or physical in nature to be deemed coercive. Psychological coercion is equally likely to result in involuntary statements, and thus is also forbidden") (citing *Mincey v. Arizona*, 437 U.S. 385, 401 (1978)). Although specious statements made by law enforcement are morally reprehensible, confessions obtained in part because of such statements are admissible evidence so long as the statements did not produce a false confession. *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir. 2002). The Ninth Circuit has also clarified that "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." *United States v. Harrison*, 34 F.3d 886, 891-92 (9th Cir. 1994) (emphasis in original). *Harrison* was extensively analyzed in *Tobias*, 996 F.3d at 582-83, where an underage suspect, at a police station, "tried—desperately—to explain to the detectives that he has nothing to do with the murder. It was only after the detective showed little interest in his explanation and repeatedly accused him of lying that [the defendant] concluded that he had no choice but to falsely confess, out of fear of the harsh treatment that [law enforcement] threatened." *Tobias* extended *Harrison*'s bright line rule to situations where a defendant "*tries* to cooperate …. but the police continue to demand cooperation until the suspect confesses." *Id.* (emphasis in original). Although *Tobias* and *Harrison* involved factually different scenarios, the Ninth Circuit's principles are relevant in Wallace's case because "run-of-the-mill suspect[s]" are no less subject to psychological coercion. *Id.* at 582-83.

This Court has considered arguments of counsel, pertinent portions of the record, and the Def. Ex. D-5 audio recording. Having done so, this Court concludes that the government has proved by a preponderance of the evidence that Wallace's statements and consent to search the safe were voluntary.

To begin, Wallace cites *United States v. Washington*, 490 F.3d 765, 767 (9th Cir. 2007) but this Court declines to apply *Washington* to his case. The law enforcement officials in *Washington* initiated a warrantless encounter that lacked reasonable suspicion or probable cause of any criminal activity. This inquiry will instead turn on the totality of the circumstances of Wallace's interrogation. Regarding Wallace's characteristics, there is nothing in the record to indicate that Wallace lacked a sufficient level of education, that his age allowed him to be easily swayed, or that he suffered from a mental or physical condition at the time of his arrest or statements. The record indicates that Wallace was aware, coherent, attentive, and understood the gravity of his situation. Wallace's characteristics therefore weigh in favor of finding his statements and consent to search the safe. *See Collazo*, 940 F.2d at 416; *see also Tobias*, 996 F.3d at 580-81; *see also Schneckloth*, 412 U.S. at 224. It is undisputed that weapons were holstered and that Wallace was handcuffed. On that point, this Court notes that handcuffing Wallace was not "calculated to pressure [him] into changing [his] mind about remaining silent." *Collazo*, 940 F.2d at 416. There was also no unreasonable break in time between executing the search warrant and Wallace's twenty-minute interrogation. Law enforcement officials were, at all times, respectful and cordial towards Wallace, which is in stark contrast with the *Collazo* law enforcement officials that spoke with "terse sentences" that were

"calculated to pressure," or with *Tobias*' ongoing threats of harsh treatment. The duration and conditions of Wallace's interrogation therefore weigh against a finding of involuntariness.

There is a closer question as to whether Wallace's statements and consent to search were psychologically coerced or improperly induced. The answer is not entirely clear, but ultimately favors the government.

Wallace understood and was properly given his *Miranda* warnings at the beginning of the custodial interrogation. *See Doody*, 548 F.3d at 860–61 (whether a defendant was given *Miranda* warnings is one circumstance to consider in determining whether a confession is voluntary but is not determinative on that question); *see also Sessoms v. Grounds*, 776 F.3d 615, 622 (9th Cir. 2015). This Court likewise agrees with the government that Wallace did not unambiguously invoke his right to counsel when he asked if "he should get a lawyer first." *Tobias*, 996 F.3d at 580-81. Wallace's statement was posed in the form of a question, and when viewed through the lens of an ordinary person, Wallace's question indicated some contemplation as to whether he might need an attorney, not an assertion of his right to counsel. *Id.* (citing *Davis v. United States*, 512 U.S. 452, 462 (1994)). Sergeant Chaffin was not required to cease the interrogation at that point and also properly responded that he was declining to proffer legal advice.

It is true that Sergeant Chaffin's statements, that Wallace's cooperation could expedite the investigation and possibly mitigate his situation, potentially presented the concerning class of investigative tactic contemplated in *Spano*, 360 U.S. at 320. Wallace, however, had been properly advised of his rights and was already talking with Sergeant

Chaffin; there was generally nothing improperly coercive from Sergeant Chaffin's decision to discuss the evidence against him, and explanations as to why Wallace should think about cooperating. *Id.* at 582-83. Neither was Wallace told that he would be penalized if he exercised his constitutional right to remain silent. *Harrison*, 34 F.3d at 891-92. Sergeant Chaffin's "two roads" statement certainly comes close to meeting *Harrison*'s bright-line rule in light of *Tobias*, but a careful review of the audio, when viewed in context, indicates that Sergeant Chaffin was instructing Wallace that *if* he decided to cooperate and lied, then his situation could potentially worsen. In other words, Sergeant Chaffin was notifying Wallace to be honest should he decide to cooperate. Moreover, the context of the interrogation is different from *Tobias*: Sergeant Chaffin was not "demanding" cooperation from Wallace, nor was there a continued demand after Wallace responded that there was one to two pounds of methamphetamine inside the safe. *Tobias*, 996 F.3d at 583. In sum, it is close, but Wallace's free will was not overborne through psychological coercion or improper inducement. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) ("The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."); *see also Collazo*, 940 F.2d at 416-17; *see also Pollard,* 290 F.3d at 1034.

Wallace's interrogation and consent to search the safe were voluntary.

## V. OBJECTIONS TO REPORT AND RECOMMENDATION

### A. Objections

Both parties have objected and have replied to the opposing parties' objections after this Court filed its Initial Report and Recommendation. Dkt. 106; Dkt. 107; Dkt. 117; Dkt. 117. The government has objected on several bases: (1) this Court should withdraw its credibility determination of Trooper Henry because he was "misremembering" or "confused" as to the identity of the October 8 driver; (2) Trooper Henry did not recklessly mislead this Court because he copied and pasted the language of his internal report into the affidavit that was based on Shelby's information and this, in turn, created an implication that Wallace and the October 8 driver were different individuals; (3) Trooper Henry did not recklessly omit the two plausible locations because they were "investigative dead-ends" since Butler said so and "there was no affirmative information that [Hobert] had been to a storage unit or had put the stolen items in a storage unit."; (4) the fair probability that the stolen items would be found in the two plausible locations does not defeat a fair probability or probable cause that the stolen items would be in Wallace's vehicle or hotel; (5) there was sufficient nexus between the stolen items and Wallace's hotel room because of Trooper Henry's training and experience, and because the stolen items are "typically carrie[d] from location to location."; (6) the firearm found in Wallace's hotel room should be admitted into evidence as a purported violation of 18 U.S.C. § 924(c) because of its proximity to the methamphetamine and currency. *See generally* Dkt. 107. Wallace responds that (1) Trooper Henry had "specific, actionable information regarding" the October 8 driver that, if included in the affidavit, would have dispelled any false suggestion that Wallace was the October 8 driver; (2) Trooper Henry's affidavit recklessly misled the issuing Judge because the information was "presented as though it was building off previous information …

establishing the likely identity of the Driver as Mr. Wallace"; (3) Trooper Henry's testimony that the two plausible location were investigative dead-ends is unreasonable because there no independent investigation was conducted; (4) the government's circular reasoning regarding the two plausible locations "bolster's the defense's case, as there was similarly no affirmative information that [Hobert] actually visited or stored evidence in Mr. Wallace's car or hotel room"; ); and (5) "the lack of nexus between Mr. Wallace's car and hotel room illuminates the materiality of the omissions regarding the other possible locations of the evidence." *See generally* Dkt. 119.

Wallace also objects on several bases: (1) this Court misidentified the law enforcement official that interrogated Wallace; (2) the fruits of SW 3952 is tainted by invalid SW 172 because law enforcement were not in a "lawful vantage point when they observed" the one to two pounds of methamphetamine; (3) law enforcement did not have an independent basis to enter Wallace's hotel nor were there any "intervening circumstances to purge the taint" of SW 172; and (4) the good-faith exception cannot save SW 3952 because, under *Leon* and its progeny, the illegality of SW 172 is not cured by any good-faith efforts by Investigator Chambers. *See generally* Dkt. 106. The government, in its reply brief, has chosen not to defend SW 3952 if SW 172 is ruled as invalid because "without a valid warrant, the United States agrees that the officers' presence in the hotel room was not justified by other exigent or independent circumstances. Thus, the observations that were made within the hotel room must be suppressed, and [SW 3952] is therefore lacking any probable cause." Dkt. 117 at 2.

37

As the government's reply brief makes clear, the stakes could not be higher: the government's case-in-chief rises or falls with the litigation surrounding SW 172 and SW 173. With that tectonic shift in mind, this Court first turns to the government's objections.

## B. SW 172 and SW 173

This Court is well aware of the importance of making credibility determinations and does not make any such determination lightly. To be clear, this Court was not making an explicit finding of negative credibility. Between "testimony and "frankly not credible" were the key words, "*on this point*." The inconsistencies and contradictions in that specific portion of Trooper Henry's testimony undermined the persuasiveness, and not the credibility, of his statements. This Court, in other words, concluded that Trooper Henry's explanations of the driver held less persuasive weight in light of conflicting evidence, but Trooper Henry's testimony overall, was generally "worthy of belief." *Compare* CREDIBILITY, Black's Law Dictionary (11th ed. 2019) ("The quality that makes something (as a witness or some evidence) worthy of belief.") *with* PERSUASIVE, Black's Law Dictionary (11th ed. 2019) ("Capable of making other people believe or do something; successfully prompting the action or decision that one wants from someone else."). To dispel any ambiguous interpretations of this Court's conclusion, this Court will amend the relevant sentences as follows: "Trooper Henry's testimony, on this point, is frankly not persuasive." This Court amended the relevant sentence to indicate that it stands by its conclusions, and the persuasive weight it gives Trooper Henry's particular testimony. Which leads us to the government's argument that the identical language in Trooper Henry's internal report and in the affidavits.

This Court agrees with Wallace that copying and pasting the internal report language into the affidavits strengthens a finding of a reckless disregard of the truth, in light of the "specific, actionable information" regarding the October 8, 2020 driver. Dkt. 119 at 1. It is important to highlight at this juncture that the government did not object to this Court's conclusions regarding the veracity of Shelby's information. With that understanding, the government's assertion that this Court should not hold Trooper Henry accountable for his lack of independent investigation because Shelby did not make "an affirmative distinction" between the October 8 driver and Wallace is unavailing. The issuing Judge, on this point, was unaware that the October 8 driver and Wallace were in fact two different individuals. The narrative of the affidavit, to the contrary, created an implied association that the October 8 was Wallace. This Court further agrees with Wallace that "nothing was done to distinguish the two, and information regarding Mr. Wallace was presented as though it was building off previous information in the affidavit — as though as the investigation progressed, Trooper Henry learned information establishing the likely identity of the driver as Mr. Wallace." Dkt. 119 at 2.

An overarching problem with Trooper Henry's investigation is that the collected information *began*, rather than *ended*, his investigation into possible leads or other sources of information. This is particularly important because probable cause had not been established and because the collected information was obtained from several layers of hearsay or from witnesses with questionable veracity. Take, for example, the affidavit's explanation that Hobert was "known to be staying with Wallace." The record indicates that the last known location of Hobert was the Ramada Inn. Butler had on more than one

occasion traveled to the Ramada Inn to pick up and drop off Hobert. Butler not only received verification from a Ramada Inn employee that Hobert might still be residing there, but also found a stolen item at that *same* hotel. The government attempts to resist this conclusion by loosely characterizing Butler's statements and actions as "partial corroborations" or "determinations" that Hobert "was no longer at the Ramada Inn." Given the fact that Rodriguez lacked veracity, was plausibly culpable in the October 8 theft, that Butler did not personally know Rodriguez, and that Butler was skeptical of Rodriguez, Trooper Henry was more than free to not accept any of Butler's conclusions or statements and instead, independently investigate in accordance with law enforcement procedure. Trooper Henry, in other words, was not required to exhibit a flair of a naivete from which ordinary citizens are free, in light of his law enforcement training and experience.

Regarding the storage locker, the government argues that there was no "affirmative information" that Hobert "had been to a storage unit." Applying this reasoning across the entire investigation would hurt, rather than strengthen, the government's contentions that Wallace's vehicle or hotel room were plausible locations. Perhaps more important here is that the government's statements are not supported by the record. To the contrary—Butler proffered several detailed, articulable statements that the stolen items might be at the storage unit. Butler, in two separate phone calls, expressly mentioned that he knew Hobert used or shared a storage unit with Hobert's "partner in crime" or family member, because Butler had, in fact, visited the storage unit *several times*. Again, Trooper Henry had the training and experience to reconcile Butler's conflicting statements regarding the storage

unit, and to further investigate since it was becoming clear that there would be a fair probability that the items would be at the storage unit. Trooper Henry did not do so.

The investigation instead homed in on Wallace. Aside of identifying Wallace and Wallace's association with Hobert, there is no evidence suggesting that Wallace, Wallace's vehicle, or Wallace's hotel room were linked to the stolen items. Weak inferences from vague facts that Hobert is not "known to have her own vehicle" and "known to be staying with Wallace" do not amount to probable cause to search Wallace's vehicle or hotel room. This Court hastens to add that Trooper Henry was not under any time pressure to further investigate or complete the affidavit. Indeed, the record indicates that Trooper Henry did not have a heightened urgency to electronically receive the audio recordings that Butler actively wanted to hand over. To fill that gap, the government argues that the stolen items are "typically carrie[d] from location to location." That is a true statement. Equally true, under that view, is that those same stolen items are typically sold, typically divided up into different locations, typically stored in locations where the conspirator was last known to reside, or shared by co-conspirators. The non-contextual fact that such items can be taken from location to location is a serious argument, but litigation is tied to the record. The government cannot meet its burden here because this case goes beyond mere disbelief of Trooper Henry; Wallace has introduced sufficient evidence that undermines Trooper Henry's account of his investigation.

Trooper Henry's investigation did not establish probable cause, manipulated the inferences the issuing Judge could draw, and omitted facts that cased doubt on the existence of probable cause. This Court, after careful consideration, concludes that SW 172 and SW

173 are invalid, and the fruits of the warrants should be suppressed. The government's objections should therefore be **DENIED**.

### C. SW 3952

Although the government did not explicitly mention the validity of SW 3952 in its initial briefings, this Court had concluded in its Initial Report and Recommendation that the fruits of SW 3952 are admissible evidence because SW 3952 established probable cause and, even if probable cause was lacking, *Leon*'s good-faith exception would apply. Dkt. 98 at 36-37. The government, in its reply brief to Wallace's objections, has now chosen to not defend the validity of SW 3952 because law enforcement entered the hotel solely because of SW 172. *See e.g.*, *United States v. Artis*, 919 F.3d 1123, 1134 (9th Cir. 2019) ("The government cannot carry that burden because it has made no effort to defend the legality of the search that yielded the evidence in question."). It is refreshing, indeed, admirable to read that the government is serious about carrying out its role that "justice shall be done." *See Berger v. United States*, 295 U.S. 78, 88 (1935). Such a candid position benefits the residents in the District of Alaska because it displays that our system of justice is governed impartially. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996). This Court, after careful review, is not persuaded by Wallace's objections and by the government's reply brief. Lest this Court's position seems quixotic or unduly harsh, it bears emphasis that the Ninth Circuit's jurisprudence has "shifted somewhat we decided *Vasey* and *Wanless*." *Artis*, 919 F.3d at 1133. *Artis* reasoned that "we can no longer declare the good-faith exception categorically inapplicable whenever a search warrant is issued on the basis of evidence illegally obtained as a result of constitutional errors by the police." *Id.* The

admissibility of the fruits of SW 3952 therefore turns on whether the "police misconduct that led to discovery of the illegally obtained evidence is itself subject to the good-faith exception." The misconduct has to be both sufficiently deliberate and sufficiently culpable to warrant suppression. *Id.* Here, both Investigator Chambers and Sergeant Chaffin acted in good-faith, the plain view discovery of the one to two pounds of methamphetamine transformed the petty theft investigation into an investigation of a serious federal crime, the interrogation and consent were voluntary, and the four corners of SW 3952 established probable cause. Taken together, there was a cogent argument that the fruits of SW 3952 were admissible evidence, in light of the principles in *Artis*, 919 F.3d at 1133-34 and *Leon*, 548 U.S. at 915-16.

Determinative here is that the burden rests with the government. *See Artis*, 919 F.3d at 1134 ("The government bears the burden of showing that the good-faith exception applies.") (citing *Underwood*, 725 F.3d at 1085). As our Chief Justice John Roberts has pointed out, "Judges are like umpires. Umpires don't make the rules, they apply them. The role of an umpire and a judge is critical. They make sure everybody plays by the rules, but it is a limited role."[5] In certain situations, a trial judge may have to intervene in a way that veers beyond the role of a mere moderator, but such concerns are not present here because Wallace's motion is in a pre-trial posture. This Court will therefore not substitute its

---

[5] Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States: Hearing before the Committee of the Judiciary, 109 Cong. 55 (2005) (Statement of John. G. Roberts, Jr.).

judgment for that of the governments; and it is with that understanding this Court reluctantly concludes that the fruits of SW 3952 should be suppressed.

This Court makes one final comment. Wallace's factual objection is well-taken and this Court will identify the correct interrogating officer. There is otherwise no need to reach Wallace's objections or the government's objection regarding the shotgun.

## VI. CONCLUSION

For the reasons set forth above, Wallace's Motion to Suppress should be **GRANTED**. 28 U.S.C. § 636(b)(1)(B).

DATED this 22nd day of November, 2022, at Anchorage, Alaska.

*s/ Matthew M. Scoble*
CHIEF U.S. MAGISTRATE JUDGE
