# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

*United States of America v. Antonio Hosea Wallace*
Case No. 3:21-cr-00059-TMB-MMS-1

By:             THE HONORABLE TIMOTHY M. BURGESS

PROCEEDINGS:    ORDER FROM CHAMBERS

The matter comes before the Court on the Final Report and Recommendation ("R&R") of the Chief Magistrate Judge,[1] recommending the Court grant Defendant Antonio Hosea Wallace's Motion to Suppress at Docket 51 (the "Motion").[2] Both Wallace and the Government object to portions of the R&R.[3] Pursuant to statute, the Court has conducted a *de novo* review,[4] and for the reasons discussed below, the Court **ACCEPTS and ADOPTS** the R&R at Docket 121 **WITH MODIFICATION**. Accordingly, the Motion at Docket 51 is **GRANTED**.

## A. Background

In early October 2020, Ryann Hobert and her friend, Shelby Rodriguez, stayed with Hobert's friend Brian Butler for two nights at his Sterling home.[5] On October 8, a man named "Cash" picked up Hobert and Rodriguez and drove them back to Anchorage, where Hobert lived.[6] Butler observed the three drive off after loading suitcases and laundry into Cash's Ford pick-up truck.[7]

On October 16, Butler called law enforcement to report a possible theft after realizing that several of a friend's personal belongings were missing from his home.[8] Trooper Michael Henry was assigned to the case.[9] Trooper Henry spoke with Butler, who informed him that he believed Hobert stole the items, which included a laptop, a camera and camera equipment, about $2,000 in cash,

---

[1] Dkt. 121 (Final R&R).
[2] Dkt. 51 (Motion).
[3] Dkt. 106 (Defense Objections); Dkt. 107 (Government Objections); Dkt. 117 (Government Response); Dkt. 119 (Defense Response).
[4] 28 U.S.C. § 636(b)(1)(C) ("Within fourteen days after being served with a copy [of the magistrate judge's proposed findings and recommendations], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").
[5] *Id.* at 4.
[6] *Id.* at 4-5.
[7] *Id.* at 5.
[8] *Id.*
[9] *Id.*

1

and clothing.[10] Butler also informed Trooper Henry that Hobert was living at the Ramada Inn and had been living there for several months.[11] Butler explained that he had called the Ramada Inn's front desk from a blocked phone number and asked to leave a message for Hobert, and that an employee had answered, "Oh yeah, yeah, she's here, she's not in the room right now but still here."[12]

On October 19, Butler and Trooper Henry spoke again on the phone.[13] Butler told Trooper Henry that he had traveled to Anchorage and found Rodriguez (but not Hobert) at the Ramada Inn.[14] According to Butler, Rodriguez had been in possession of the stolen laptop and told him that Hobert had "dumped" her at the Ramada Inn with the laptop.[15] Butler said Rodriguez told him that Hobert had tricked her into being a part of Hobert's premeditated plan of theft, and that she had not talked to Hobert or been able to find Hobert since Hobert "got into the vehicle that had come down here to pick them up."[16] Butler also said that Rodriguez told him that she did not know the person who drove her and Hobert to Anchorage on October 8, but she did know "the guy that [Hobert] is hanging out with right now. . . . [T]he first name is Anthony, Tony. [Hobert] calls him Tone."[17] Butler further stated that Rodriguez mentioned that Hobert had been staying at the Extended Stay Hotel on 8th Avenue in Anchorage but had failed to find Hobert after visiting several times.[18] Butler also said that he searched Rodriguez's room and did not find any of the remaining stolen property.[19] Finally, Butler stated that Hobert had a storage unit at Ship Creek Storage that he had visited several times before and opined that Trooper Henry "might probably find some stuff over there, wouldn't surprise me one bit."[20]

After this conversation, Trooper Henry called the Extended Stay Hotel on 8th Avenue and verified with an employee that nobody named "Ryann" was staying at the hotel.[21] Trooper Henry did not investigate the storage unit lead.

On October 20, Butler and Trooper Henry had another phone conversation.[22] Among other things, Butler told Trooper Henry that the storage unit was not a credible lead and to "forget about [it]."[23] Butler explained that he had run three specific names (including Hobert and Hobert's mother) by a storage unit employee, and that the employee had replied that Hobert's "mother closed her

---

[10] *Id.*
[11] *Id.* at 6.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 6–7.
[15] *Id.* at 7.
[16] *Id.*
[17] *Id.* at 7–8.
[18] *Id.* at 8.
[19] *Id.* at 7.
[20] *Id.* at 8.
[21] *Id.*
[22] *Id.* at 9.
[23] *Id.* at 10.

account in the Spring."[24] Butler also said he had had another conversation with Rodriguez, who told him that "Tone" was Black and on ankle monitoring.[25]

Relying on Hobert's Facebook account and the general descriptive details provided by Butler, Trooper Henry identified Wallace as the person Rodriguez had referred to as "Tone."[26] Trooper Henry then discovered that Wallace had listed "Rice Hobert" as an emergency contact with the Department of Corrections.[27] Trooper Henry also learned that Wallace owned a gold Chevrolet four-door car.[28] Furthermore, data from Wallace's ankle monitor showed that on October 20 at 12:40 PM, he was located at the Extended Stay Hotel at 34th Avenue in Anchorage.[29]

Trooper Henry then applied for two search warrants, one to search Wallace's hotel room ("SW 172") and another to search Wallace's vehicle ("SW 173").[30] Officers executed both search warrants in the late morning of October 21, 2020.[31] While executing SW 172, they found Hobert and Wallace, and seized a firearm found underneath a bed, materials generally used for controlled substance purposes, and a safe, whose mounting holes revealed apparent controlled substances and currency inside.[32] While executing SW 173, officers seized a firearm found under the driver's seat of Wallace's vehicle.[33] The officers also detained and interrogated Wallace, who eventually gave consent to search the safe.[34]

Later that day, another officer—Investigator Richard Chambers—applied for a warrant to search Wallace's hotel room and seize the controlled substances and related accessories found while executing SW 172 ("SW 3952").[35]

### B. Motion to Suppress

Wallace filed the Motion on March 14, 2022, seeking to suppress the evidence and statements obtained from the execution of all three search warrants.[36] Wallace also requested an evidentiary hearing.[37] The Government filed an Opposition to the Motion on March 29, 2022.[38] The Magistrate Judge granted Wallace's request for an evidentiary hearing and held a two-day hearing in June

---

[24] *Id.*
[25] *Id.* at 9.
[26] *Id.* at 10–11.
[27] *Id.*
[28] *Id.* at 11.
[29] *Id.*
[30] *Id.* at 11–12.
[31] *Id.* at 12.
[32] *Id.* at 12–13.
[33] *Id.*
[34] *Id.* at 13.
[35] *Id.* at 15.
[36] Dkt. 51.
[37] *Id.*
[38] Dkt. 61.

2022.³⁹ Both Trooper Henry and Sergeant David Chaffin, one of the officers who executed SWs 172 and 173 and interrogated Wallace, testified at the hearing.⁴⁰ After the hearing, the parties filed supplemental briefing in support of their respective positions.⁴¹

In the Motion, Wallace argues that SWs 172 and 173 are invalid because they (1) were based on stale information given that the "one-time" theft had occurred nearly two weeks earlier; (2) omitted the material facts that "neither Wallace nor his vehicle was involved in the theft or subsequent transport" of the stolen property, and that Hobert "was confirmed to still be residing at the Ramada Inn as of at least October 16, 2020"; and (3) failed to establish a sufficient nexus between the locations to be searched and the alleged theft of Butler's friend's personal belongings.⁴² Wallace further argues that officers exceeded the scope of SW 173, which did not authorize seizure of any firearms, by seizing the firearm in Wallace's vehicle.⁴³ Finally, Wallace argues that SW 3952 is invalid because it was premised solely on evidence and statements obtained as a result of the officers' unlawful entry into Wallace's hotel room; in the alternative, Wallace argues that SW 3952 is invalid because the officers coerced his consent to open the safe during his detention and interrogation.⁴⁴

### C. Final Report & Recommendation

The Magistrate Judge recommends that the Court grant the Motion,⁴⁵ determining that SWs 172 and 173 were invalid because Trooper Henry made several recklessly misleading statements and omissions that were necessary to the state magistrate judge's probable cause determination.⁴⁶ Specifically, the Magistrate Judge determines that Trooper Henry (1) recklessly implied that Wallace was the same man mentioned in the affidavits who "drove [Hobert and Rodriguez] to Anchorage, along with the rest of the stolen property"; (2) "recklessly omitt[ed] that Butler had called the Ramada Inn, a known location associated with Hobert, and received some verification that Hobert was living or was located at the Ramada Inn on October 16"; and (3) "recklessly omitt[ed] the Ship Creek storage unit as a plausible lead that . . . would have cast doubt on Wallace's vehicle and hotel room as possible locations of the stolen items."⁴⁷

The Magistrate Judge further finds that the affidavits supporting SWs 172 and 173 did not establish a "reasonable nexus between the crime or evidence and the location[s] to be searched."⁴⁸

---

³⁹ Dkt. 72 (Minute Entry); Dkt. 73 (Minute Entry).
⁴⁰ Dkt. 65 (Text Order); Dkt. 77 (Transcript of Evidentiary Hearing on Motion to Suppress Held on June 3, 2022); Dkt. 78 (Transcript of Evidentiary Hearing on Motion to Suppress Held on June 8, 2022).
⁴¹ Dkt. 85 (Defense Supplement); Dkt. 86 (Government Supplement).
⁴² Dkt. 51 at 1, 14, 17–18.
⁴³ *Id.* at 2.
⁴⁴ *Id.* at 2–3.
⁴⁵ Dkt. 121.
⁴⁶ *Id.* at 24–27.
⁴⁷ *Id.* at 23–24.
⁴⁸ *Id.* at 29–30.

Moreover, the Magistrate Judge concludes that the good-faith exception to the exclusionary rule does not apply in light of Trooper Henry's recklessly misleading statements and omissions.[49] For these reasons, the R&R recommends suppression of the evidence seized pursuant to SWs 172 and 173.[50]

The R&R similarly recommends suppressing the evidence seized pursuant to SW 3952, citing the Government's agreement with Wallace that if SWs 172 and 173 are invalid, then officers had no lawful basis to enter Wallace's hotel room, where they obtained the evidence and statements used to seek SW 3952.[51] The Magistrate Judge states that although "there was a cogent argument that the fruits of SW 3952 were admissible evidence"—including because Wallace's statements and consent to search the safe, given when law enforcement was executing SWs 172 and 173, were voluntary[52]—the Government's choice not to defend the admissibility of this evidence means that it did not meet its burden of showing that an exception to the exclusionary rule applies.[53]

### D. Objections

The Magistrate Judge filed his initial Report and Recommendation (the "Initial R&R") on September 30, 2022;[54] both parties subsequently filed objections to the Initial R&R and responses to the other's objections.[55] After reviewing these filings, the Magistrate Judge addressed the parties' objections and responses and revised certain aspects when filing the R&R on November 22, 2022.[56] The parties' unresolved objections are summarized as follows.

The Government disagrees with the Magistrate Judge's overall conclusion that SWs 172 and 173 were invalid and that the evidence obtained pursuant to their execution should be suppressed.[57] More specifically, the Government objects to the conclusions that (1) Trooper Henry recklessly implied that Wallace was the same individual who drove Hobert to Anchorage on October 8,[58] (2) Trooper Henry recklessly omitted the Ramada Inn and a Ship Creek Storage locker as potential locations of the stolen property,[59] (3) the omission of these two other locations was material because the possibility that the stolen property might have been found elsewhere "does not defeat" any probable cause that existed to search Wallace's hotel room and vehicle,[60] and (4) Trooper Henry's affidavit supporting SW 172 did not establish a sufficient nexus between the stolen property and Wallace's hotel room.[61]

---

[49] *Id.* at 23–23.
[50] *Id.* at 30.
[51] *Id.* at 42–44.
[52] *Id.* at 43, 33–35.
[53] *Id.* at 42–44.
[54] Dkt. 98 (Initial R&R).
[55] Dkt. 106; Dkt. 107; Dkt. 117; Dkt. 119.
[56] *See* Dkt. 121 at 35–44.
[57] Dkt. 107.
[58] *Id.* at 3–5.
[59] *Id.* at 5–7.
[60] *Id.* at 7–9.
[61] *Id.* at 9–10.

Wallace's objections, meanwhile, focus solely on the Magistrate Judge's treatment of SW 3952. First, Wallace argues that all evidence obtained in connection with this search warrant must be suppressed because there was "*no* untainted evidence presented that could support probable cause."[62] Second, Wallace objects to the Magistrate Judge's suggestion that had the Government not declined to defend the validity of SW 3952, the good-faith exception to the exclusionary rule would apply and save the fruits of SW 3952 from suppression.[63] And third, Wallace objects to the Magistrate Judge's conclusion that his statements and consent to open the safe—which contributed to the probable cause supporting SW 3952—were voluntarily given.[64]

   *E. Discussion*

After a *de novo* review of the R&R, the parties' objections, and the record, the Court agrees with the Magistrate Judge's recommendation to grant the Motion, finding that the evidence obtained pursuant to all three searches must be suppressed due to the recklessly misleading nature of the affidavits supporting SWs 172 and 173. Although some of the parties' objections raise issues that merit the Court's modification of discrete portions of the R&R, as described below, these objections do not alter the Court's conclusion that the evidence obtained pursuant to all three searches is inadmissible.

   1. The Affidavits Supporting SWs 172 and 173 Contain Recklessly and Materially Misleading Implications and Misstatements

The Magistrate Judge concludes that Trooper Henry recklessly and materially misled the state magistrate judge who issued SWs 172 and 173, meaning that (1) those search warrants were invalid and (2) the good-faith exception to the exclusionary rule does not save the evidence obtained during those searches from suppression.[65] The Government's objections to these conclusions are discussed in detail below.

      *a. Trooper Henry recklessly implied that Wallace was the same individual who drove Hobert and Rodriguez to Anchorage*

The Government first objects to the Magistrate Judge's conclusion that Trooper Henry recklessly implied that Wallace was the same individual who drove Hobert and Rodriguez to Anchorage.[66] The Government argues that the affidavits supporting SWs 172 and 173 did not create the false impression that Wallace and the driver were the same individual because Trooper Henry "positively identif[ied]" Wallace but not the driver.[67] Wallace disagrees with this interpretation, arguing that Trooper Henry did nothing to distinguish the two individuals, and "information

---

[62] Dkt. 106 at 2–3 (emphasis in original).
[63] *Id.* at 4–6.
[64] *Id.* at 3.
[65] Dkt. 121 at 23–30.
[66] Dkt. 107 at 4–5.
[67] *Id.* at 5.

6

regarding Wallace was presented as though it was building off previous information in the affidavit—as though as if Trooper Henry had learned information establishing the likely identity of the driver as Wallace as the investigation progressed.[68] For purposes of clarity, the Court separately addresses the affidavits supporting each search warrant.

### i. SW 172

Turning first to SW 172, the Court acknowledges that the supporting affidavit does not explicitly suggest that the driver was Wallace. Indeed, at first glance, one might come away with the impression that the two individuals are distinct: in Trooper Henry's description of a conversation he had with Butler on October 19, he chooses to not identify the driver (apart from saying the driver was a man), but then later identifies Wallace as a "[black] guy named Anthony" believed to be on parole and ankle monitoring with whom Hobert was "hanging out."[69] This language seems to imply that Wallace was *not* the driver.

But read in the context of the whole affidavit, this language, combined with the overall narrative, obscures the critical fact that the two individuals were different. Trooper Henry included certain details suggesting a link between Wallace and the driver, such as information about Wallace's car, without providing context for why they were included. And as Wallace points out, Trooper Henry failed to distinguish the two individuals, despite knowing at the time he wrote the affidavit that they were different. In particular, Trooper Henry was aware that: (1) according to Butler, a man named "Cash" from Cooper Landing drove Hobert and Rodriguez to Anchorage on October 8; (2) Cash drove a truck (Ford extended cab), not the sedan that was registered to Wallace;[70] and (3) Rodriguez confirmed that the driver was not the person with whom Hobert had been "hanging out." Because Trooper Henry omitted any statements or information distinguishing Wallace from the driver, the affidavit supporting SW 172 is unclear on this crucial issue.[71]

The ambiguity in the affidavit supporting SW 172 creates a relatively strong inference that Wallace was the driver. Without that inference, the link between Wallace and the stolen property is insufficient to support probable cause. The affidavit asserts that Hobert was reported to have been "hanging out" with a "[Black] guy named Anthony" believed to be on parole and ankle monitoring, and whom the affidavit later identified as likely to be Wallace.[72] But Wallace was not identified as a suspect in the theft and the affidavit did not state that Hobert was *living* with him; instead, there was evidence to the contrary. According to the affidavit, Rodriguez had said that "the last she knew, [Hobert] was staying at the Extended Stay hotel on 8th Street in Anchorage," a different hotel than the hotel at which Wallace had been located (the Extended Stay on *34th Avenue* in

---

[68] Dkt. 119 at 2.
[69] *See* Dkt. 51-1 at 7–8 (SW 172).
[70] Def. Ex. D-2 at 8:50-9:06 (Audio File of Butler's Initial Complaint to Trooper Henry).
[71] *See United States v. Perkins*, 850 F.3d 1109, 1119 (9th Cir. 2017) (concluding law enforcement "omitted facts required to prevent technically true statements in the affidavit from being misleading").
[72] Dkt. 51-1 at 8.

Anchorage).[73] Furthermore, Butler told Trooper Henry—four days before Trooper Henry applied for the warrant—that the Ramada Inn had confirmed Hobert was still staying there.[74] The only other piece of information connecting Hobert and Wallace was that Wallace listed Hobert's alias as an emergency contact with the Alaska Department of Corrections. These facts, on their own, do not establish a fair probability that the stolen property was located in Wallace's hotel room.[75]

For these reasons, the Court agrees with the Magistrate Judge that Trooper Henry's omissions in the affidavit supporting SW 172 create a reasonable inference that Wallace was the driver. Moreover, in light of the facts known to Trooper Henry at the time, as detailed in his internal report, the Court agrees that these omissions displayed a "reckless disregard of the truth."[76]

    ii. SW 173

Turning next to SW 173, the Court similarly agrees with the Magistrate Judge that the fruits of the search conducted pursuant to this warrant must be suppressed under *Franks v. Delaware*[77] because of Trooper Henry's reckless and material omissions. This, in turn, means that "*Leon*'s good-faith exception is categorically inapplicable."[78] However, the Court wishes to clarify the portion of the Magistrate Judge's *Franks* analysis which uses a corrected affidavit "to fully determine whether the misleading statement and omissions 'cast[ed] doubt on the existence of probable cause.'"[79] In particular, the Court modifies this analysis to provide that correcting the affidavit includes purging the statement that Hobert was "known to be staying with Wallace.[80]

---

[73] *Id.*
[74] Dkt. 77 at 47, 49.
[75] *See United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (citing *Illinois v. Gates*, 462 U.S. 213, 246 (1983)) ("[P]robable cause means a 'fair probability' that contraband or evidence is located in a particular place. Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question.'").
[76] *See United States v. Elmore*, 917 F.3d 1068, 1077 (9th Cir. 2019) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).
[77] 438 U.S. 154 (1978). Under *Franks*, a criminal defendant has the right to challenge the veracity of statements made in support of an application for a search warrant. *Id.* at 155–56. To prevail on a *Franks* challenge, the defendant must establish by a preponderance of the evidence that (1) "the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant[,]" and (2) the false or misleading statement or omission was material, *i.e.*, "necessary to finding probable cause." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (internal quotation marks omitted) (alteration in original). If both requirements are met, "the search warrant must be voided and the fruits of the search excluded . . . ." *Id.* at 1116 (quoting *Franks*, 438 U.S. at 156).
[78] Dkt. 121 at 27; *see also Elmore*, 917 F.3d at 1077 (recognizing that the good-faith exception does not apply in cases where "the magistrate or judge . . . was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth").
[79] Dkt. 121 at 27 (quoting *Crow v. Cnty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010)).
[80] *See* Dkt. 51-4 at 8 (SW 173).

An affidavit, corrected only to clarify the fact that Wallace was not the aforementioned driver, would likely be sufficient to establish probable cause because the affidavit would still contain the assertion that Hobert was "known to be staying with Wallace."[81] Trooper Henry explained that in his experience, "people who are staying in hotels often store some of their property in their vehicle," and "people who steal property often store stolen property in their vehicle."[82] Trooper Henry also noted that Hobert was "not known to have her own vehicle."[83] This information and the reasonable inferences drawn from it likely establish a fair probability that the stolen property would be found in Wallace's vehicle.

But Trooper Henry greatly exaggerated the likelihood, based on the information he had at the time, that Hobert was staying with Wallace. Consistent with the rest of his investigation, which was plagued by a lack of thoroughness,[84] Trooper Henry hardly looked into whether this was the case.[85] Moreover, the record shows significant evidence indicating Hobert might have been staying at the Ramada Inn, where she had been staying for the last few months and whose staff confirmed on October 16 that she was still staying there.[86] The affidavit did not mention any of this information, which would have cast doubt on the possibility that Hobert was staying with Wallace.[87]

In jumping to the conclusion that Hobert was staying with Wallace, Trooper Henry disregarded considerable evidence to the contrary and clear markers of unreliability from Rodriguez, who was the sole source of information regarding Hobert's connection to Wallace.[88] Trooper Henry's statement that Hobert was known to be staying with Wallace was therefore reckless.[89] Without

---

[81] *See id.*

[82] *Id.*

[83] *Id.*

[84] The Court mentions this point, which the Magistrate Judge discusses in detail, not to personally criticize Trooper Henry, but rather to emphasize that the problematic investigative work in this case is at the heart of the warrants' defects. *See* Dkt. 121 at 24–25, 39–41.

[85] The only investigative work Trooper Henry appears to have done on Hobert's whereabouts is a call on October 19 to the Extended Stay on 8th Avenue, asking to be connected to "Ryann's room"; the hotel told him they did not have a guest staying under that name. Dkt. 61-1 at 9 (Alaska DPS Incident Report). This cursory inquiry may have weakly ruled out the possibility that Hobert was staying there, but to the extent that it did, it further suggested Rodriguez might not have been a reliable source of information.

[86] Def. Ex. D-2 at 5:59-6:39; Def. Ex. D-3 at 0:37-1:13 (Audio File of Butler's Call to Trooper Henry).

[87] *Cf. United States v. Ramirez*, 993 F.2d 886, at *3 (9th Cir. 1993) (table op.) (affirming district court's finding that detective's statement did not contain deliberate falsity or show reckless disregard for the truth, explaining that "[a]lthough it is possible that the odor could have come from another residence near 116 South Government Way, no evidence was presented that [the detective] did not believe in good faith that the odor came from 116 South Government Way").

[88] *See* Dkt. 121 at 25–26.

[89] *Cf. United States v. Martinez-Garcia*, 397 F.3d 1205, 1215–16 (9th Cir. 2006) (holding it was not reckless for an affiant to state there was probable cause to believe evidence of narcotics crimes would be found at a residence, even though a known drug distributor's connection to that residence

this statement (and with the clarification that Wallace was not the driver), the affidavit does not establish probable cause to search Wallace's car. As a result, Trooper Henry deprived the magistrate judge of the opportunity to weigh the likelihood that Hobert was staying with Wallace, and the corresponding likelihood that the stolen property would be found in Wallace's car.[90]

               b. *Trooper Henry recklessly omitted the Ramada Inn lead but not the Ship Creek Storage locker lead*

The Government next objects to the conclusion that Trooper Henry's omission of the possibility that Hobert was storing at least some of the stolen property at a Ship Creek Storage locker or at the Ramada Inn was reckless or material.[91]

With respect to the storage unit, the Government argues that Trooper Henry reasonably concluded this lead was a dead end because the only information about its existence came from Butler, who said as much.[92] The Government adds that Trooper Henry had no "affirmative information" that Hobert had been to a storage unit or had put the stolen property in a storage unit.[93] With respect to the Ramada Inn, the Government argues that Trooper Henry reasonably concluded Hobert was no longer residing there because Butler had seen neither Hobert nor the stolen property there, and because Hobert "had last been seen leaving the Ramada Inn" with the stolen items in tow.[94] Wallace responds that Trooper Henry's "beliefs" regarding these two alternative locations are suspect and unreasonable because he did not independently investigate them as possible locations for the stolen property.[95]

---

was somewhat weakened by facts suggesting he did not actually live there, because the affidavit established probable cause based on other pieces of reliable data, including tips from informants who had visited the residence multiple times and corroboration through official police and driving records).

[90] *Cf. United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) (reasoning that although individual inferences "standing alone may be reasonable, . . . with each succeeding inference, the last reached is less and less likely to be true"). It is true that Hobert was, indeed, staying with Wallace. Dkt. 61-1 at 16–17. Just because Trooper Henry happened to draw this correct conclusion, however, does not mitigate the fact that he provided an "incomplete and misleading description" of the facts before him at the time. *See Perkins*, 850 F.3d at 1118–19.

[91] Dkt. 107 at 5–8. As an initial matter, the Court notes that although it will address these objections as a part of its *de novo* review, they have no bearing on the issue of suppression. As discussed above, Trooper Henry recklessly implied that Wallace was the individual who drove Hobert and Rodriguez to Anchorage and recklessly stated that Hobert was "known to be staying with Wallace," and these omissions and misstatement were material. Suppression is therefore required under *Franks* regardless of whether Trooper Henry should have included information about the Ramada Inn or the Ship Creek Storage locker in the affidavits supporting SWs 172 and 173.

[92] *Id.*

[93] *Id.*

[94] *Id.* at 5–6.

[95] Dkt. 106 at 2.

10

The Court agrees with the Magistrate Judge that Trooper Henry recklessly omitted information regarding the Ramada Inn and that this omission was material. By failing to include information indicating that Hobert might have been staying there, Trooper Henry made it seem as though it was confirmed that Hobert was staying with Wallace at the Extended Stay on 34th Avenue. As explained above, the failure to report "the total story" resulted in a "skewed version of events" that "overstated" the possibility of Hobert staying with Wallace, and, as a result, overstated the possibility of the stolen property being located in Wallace's hotel room or car.[96]

However, the Court disagrees with the Magistrate Judge that Trooper Henry recklessly omitted the possibility of the stolen property being located at the Ship Creek Storage locker and that this omission was material. Determining whether an omission was material requires assessing whether the omission was "necessary to finding probable cause."[97] The Government's position on this point has merit: the mere possibility that the stolen property might be found at an alternative location does not necessarily attenuate any probable cause to search another location.[98] Because Trooper Henry's omission of the Ship Creek Storage locker lead would not have been necessary to a probable cause finding, it was not material. Trooper Henry's failure to investigate the storage locker lead certainly reflects the cursory nature of his overall investigation and an overreliance on Butler's sleuthing and opinions. However, it was not unreasonable to the point of showing a reckless disregard for the truth when Trooper Henry did not investigate this lead after Butler conducted some investigative work and told him it was no longer viable.[99]

In sum, because the affidavits supporting SWs 172 and 173 contain recklessly misleading omissions and misstatements that were material to the magistrate judge's probable cause finding, the evidence obtained from the searches conducted pursuant to these warrants is suppressed. In accordance with the discussion above, the Court modifies the R&R to reflect that: (1) a corrected

---

[96] *See Perkins*, 850 F.3d at 1118.
[97] *See id.* at 1116 (quoting *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214–15 (9th Cir. 2005)).
[98] Dkt. 107 at 7–8; *see also United States v. Burkhart*, 602 F.3d 1201, 1207–08 (10th Cir. 2010) ("Probable cause means that a fair probability exists that the evidence to be seized will be found in a particular place, not absolute certainty to the exclusion of all other places. If one warrant can authorize a search for multiple locations, surely law enforcement may obtain multiple warrants for multiple locations, so long as they demonstrate probable cause as to each location."); *Nordlund v. Eubank*, No. 3:20-CV-00085-JMK, 2021 WL 6050674, at *4 (D. Alaska Dec. 21, 2021) ("[P]robable cause is by definition a standard that hinges on probability rather than certainty, so a showing of probable cause need not rule out other explanations that are merely possible." (quoting *Yi v. Yang*, 282 P.3d 340, 346–47 (Alaska 2012))).
[99] *Cf. United States v. Miller*, 753 F.2d 1475, 1479–81 (9th Cir. 1985) (affirming district court's finding that affidavit established probable cause despite investigating officers' failure to "do anything relevant on their own to corroborate" an informant's statements); *Franks*, 438 U.S. at 164–65 (explaining that the Fourth Amendment requires "truthful" and factual showing of probable cause "in the sense that the information put forth is believed or appropriately accepted by the affiant as true").

affidavit supporting SW 173 must not contain the recklessly misleading and material statement that Hobert was "known to be staying with Wallace"; and (2) Trooper Henry did not recklessly omit the Ship Creek Storage locker lead, and even if this omission were reckless, it was not material.

   2. The Fruits of SW 3952 Are Inadmissible

The Magistrate Judge "reluctantly concludes" in the R&R that the evidence obtained during the execution of SW 3952 should be suppressed because the Government took the position that if SWs 172 and 173 are invalid, there is no independent basis for validating SW 3952.[100] This is a change from the Initial R&R, which had concluded that the fruits of SW 3952 are admissible evidence because SW 3952 established probable cause,[101] and even if probable cause was lacking, the good-faith exception would apply.[102]

The Magistrate Judge nevertheless disagrees with Wallace's objections that SW 3952 was tainted and that the good-faith exception does not apply.[103] The Magistrate Judge explains that "[t]he admissibility of the fruits of SW 3952 . . . turns on whether the 'police misconduct that led to the discovery of the illegally obtained evidence is itself subject to the good-faith exception.'"[104] The Magistrate Judge then notes that "both Investigator Chambers [the officer who wrote SW 3952] and Sergeant Chaffin [one of the officers who executed SWs 172 and 173 and interrogated Wallace] acted in good-faith, the plain view discovery of the one to two pounds of methamphetamine transformed the petty theft investigation into an investigation of a serious federal crime, the interrogation and consent were voluntary, and the four corners of SW 3952 established probable cause."[105] This analysis seems to suggest that, had the Government attempted to defend the validity of SW 3952, the fruits of that search would be admissible.

Although the Court agrees that the fruits of SW 3952 are inadmissible, the Court declines to adopt the portions of the R&R that suggest these fruits would ordinarily be admissible for two reasons. First, as Wallace points out, the application for SW 3952 does not establish probable cause because it "consisted entirely of facts . . . derived as a result of the exploitation of the previous illegal search

---

[100] Dkt. 121 at 43–44.
[101] The Initial R&R explained that probable cause existed because Wallace voluntarily consented to opening the safe and because "the four corners of the affidavit contained more than sufficient information that connected criminal activity to Wallace's hotel room: (1) law enforcement found bulk quantities of "jewelers [sic] baggies and a digital scale with what appears to be methamphetamine residue"; (2) law enforcement observed a significant amount of methamphetamine inside the mounted holes of a safe; (3) and that after opening the safe, it was verified that there was methamphetamine and $14,000 in currency." Dkt. 98 at 36.
[102] *Id.* at 36–37.
[103] Dkt. 121 at 42; *see also* Dkt. 117 at 2 ("[W]ithout a valid warrant, the United States agrees that the officers' presence in the room was not justified by other exigent or independent circumstances. Thus, the observations that were made within the hotel room must be suppressed, and [SW 3952] is therefore lacking any probable cause.").
[104] *Id.* at 42–43 (quoting *United States v. Artis*, 919 F.3d 1123, 1133 (9th Cir. 2019)).
[105] *Id.* at 43.

12

warrant [SW 172]."[106] Namely, the application for SW 3952 stated that law enforcement had "located a bulk [quantity] of jewelers baggies and a digital scale with what appears to be methamphetamine residue and a [locked] safe in the bedroom of the hotel room. . . . [I]nvestigators could see a plastic bag through a hole in the back of the safe with what investigators believe to be several ounces or pounds of methamphetamine with a bulk amount of currency."[107] The officers' discovery of these items—and the statements and consent they obtained from Wallace—resulted directly from their execution of invalid SW 172. Absent SW 172, the officers had no independent basis for being in Wallace's hotel room or for detaining and interrogating him. Without the evidence obtained from SW 172, SW 3952 lacks probable cause.

And second, there is no need to engage in an alternative analysis of the validity of SW 3952 because the Government has elected not to "defend the legality of the search that yielded the evidence in question."[108] As a result, the Government cannot meet its burden of showing that the good-faith exception or any other exception to the exclusionary rule applies. Moreover, if the Court were to undertake an analysis of law enforcement's good faith, it would focus on Trooper Henry as the relevant actor, as it is *his* misconduct—namely, his misleading statement and omissions in support of the warrant applications—that "led to discovery of the illegally obtained evidence."[109] Whether Sergeant Chaffin and Investigator Chambers acted in good faith is immaterial to this analysis. As Wallace correctly observes, "Trooper Henry's misconduct in obtaining search warrants cannot be insulated by simply handing off the warrant for execution by other officers who may be unaware of the circumstances under which it was obtained."[110]

3. The Voluntariness of Wallace's Statements and Consent to Search the Safe Is No Longer at Issue

The R&R analyzes the voluntariness of Wallace's statements and consent to search the safe and concludes that they were voluntary.[111] Wallace objects to this conclusion.[112] In light of the Magistrate Judge's position that the fruits of SW 3952 are inadmissible, with which the Court agrees, a voluntariness analysis is ultimately unnecessary.[113] Because the Court concludes on other grounds that the fruits of SW 3952 must be suppressed,[114] the Court declines to adopt the analysis

---

[106] Dkt. 106 at 3–4.
[107] Dkt. 51-6 at 3 (SW 3952).
[108] *See Artis*, 919 F.3d at 1134.
[109] *See id.* at 1133.
[110] Dkt. 106 at 6; *see also United States v. DeLeon,* 979 F.2d 761, 764 (9th Cir. 1992) ("As the Supreme Court noted in *Franks*, 'police [can]not insulate one officer's deliberate misstatements merely by relaying it through [another officer] personally ignorant of its falsity.'" (first alteration in original) (quoting *Franks*, 438 U.S. at 164 n.6)).
[111] Dkt. 121 at 31–35.
[112] Dkt. 51 at 2–3; Dkt. 106 at 3.
[113] A voluntariness analysis would be applicable only if suppression were not otherwise warranted.
[114] As explained above, the fruits of SW 3952 are inadmissible because that search warrant lacked probable cause and the Government has not met its burden of validating SWs 172 and 173 through an exception to the exclusionary rule.

13

in the R&R as it pertains to the voluntariness of Wallace's statements and his consent to search the safe.[115]

### F. Conclusion

The Court concludes that the parties' remaining objections merit the aforementioned modifications to the R&R. Despite these limited revisions, however, the Court agrees with the Magistrate Judge's conclusion that the evidence obtained pursuant to all three searches must be suppressed. Accordingly, the Court **ACCEPTS AND ADOPTS** the R&R at Docket 121 **WITH MODIFICATION** in accordance with this Order's foregoing reasoning and **GRANTS** the Motion at Docket 51.

Entered at the direction of the Honorable Timothy M. Burgess, United States District Judge.

DATE: February 8, 2023.

---

[115] *See* Dkt. 121 at 31–35.